IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Lavertis Stewart, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  20 C 50194 |
| | ) | |
| vs. | ) | |
| | ) | Judge Philip G. Reinhard |
| Wexford Health Sources, Inc., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

For the reasons stated below, the IDOC Defendants' motion [94] to dismiss is granted. The Wexford Defendants' motion [88] to dismiss is granted as to Dominguez, James, and Funk and denied as to Wexford, Chamberlain, and Rankin.  If plaintiff believes he can file an amended complaint as to the dismissed defendants that comports with the requirements of Fed. R. Civ. P. 11, he may do so on or before December 30, 2022.  The parties are directed to contact Magistrate Judge Jensen within 30 days to explore settlement possibilities.

## STATEMENT-OPINION

Plaintiff, Lavertis Stewart, brings this action, via his first amended complaint [26], against defendants, Wexford Health Sources, Inc. ("Wexford"), Dr. Timothy Chamberlain, Dr. Arthur Funk, Dr. James, Dr. Bessie Dominguez, Dr. Rankin, John Varga, James Martens, John Baldwin, and Sarah Johnson, pursuant to 42 U.S.C. §1983 claiming deliberate indifference to his serious medical needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiff was an inmate in the Illinois Department of Corrections ("IDOC") at the Dixon Correctional Center ("Dixon").  Wexford has a contract with the State of Illinois to provide medical care and treatment to IDOC inmates, including at Dixon.  Doctors Chamberlain, Funk, James, Dominguez, and Rankin were Wexford employees.  Funk was Wexford's Regional Medical Director with responsibility for Dixon.  Chamberlain was Wexford's Facilities Medical Director at Dixon.  Varga, Martens, Baldwin, and Johnson were IDOC employees.  Varga was Dixon's warden.  Martens was Dixon's facility grievance officer. Johnson was the Chairperson of IDOC's Administrative Review Board ("ARB") in the Office of Inmate Issues.  Baldwin was the Director of IDOC.

Wexford, Funk, Dominguez, Chamberlain, James, and Rankin (collectively "Wexford Defendants") have moved [88] to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  Varga, Martens, Johnson, and Baldwin (collectively "IDOC Defendants") have moved [94] to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) as well.

On a motion to dismiss, the court construes the complaint in the light most favorable to the plaintiff, accepting all well-pleaded facts as true, and drawing all reasonable inferences in the plaintiff's favor. *Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021).  To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must contain a "short and

plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). If the complaint (1) describes the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests and (2) plausibly suggests that the plaintiff has a right to relief above a speculative level, this requirement is met. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v, Iqbal*, 556 U.S. 662 (2009). If plaintiff alleges "simply, concisely, and directly" the events that entitle him to damages from defendant, he has met his pleading burden. *Johnson v. Shelby*, 574 U.S. 10, 12 (2014). If plaintiff informs defendant of the factual basis for his complaint, he is "required to do no more to stave off threshold dismissal for want of an adequate statement of [his] claim." *Id.*

Plaintiff's claim is that he suffered significantly from the failure of Wexford's physician-employees to properly treat a hernia. He alleges this failure to properly treat his hernia was pursuant to a Wexford policy to deny surgical repair of hernias as cosmetic and elective. He alleges the failure to properly treat his hernia from its onset, and over the course of nearly two years, caused him excruciating pain and led to a surgery which, when finally performed, produced severe complications and further extreme pain. He alleges he also suffered from the IDOC Defendants' failure to properly respond to his grievances about the failure of Wexford, and its physician-employees, to provide proper treatment for his hernia. He maintains he is entitled to relief in the form of damages on this claim against all defendants under 42 U.S.C. §1983 because each defendant was deliberately indifferent to his serious medical needs in violation of his right under the Eighth and Fourteenth Amendments to the United States Constitution to be free from cruel and unusual punishment.

"To state an Eighth Amendment claim based on deficient medical care, a plaintiff must allege an objectively serious medical condition and an official's deliberate indifference to that condition." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015). "Deliberate indifference occurs when a defendant realizes that a substantial risk of serious harm exists, but then disregards that risk," *Id.* "The deliberate indifference standard reflects a mental state somewhere between the culpability poles of negligence and purpose, and thus is properly equated with reckless disregard." *Id.* at 777. "Deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers 'blatantly inappropriate' medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Id.* (citations omitted).

The short version of plaintiff's complaint is that he first saw a Wexford health care professional on June 17, 2016 for groin pain and was diagnosed with an inguinal hernia on August 9, 2016; thereafter he saw a string of Wexford health care professionals—doctors, nurses, nurse practitioners—on numerous occasions complaining of the excruciating pain he was suffering from his hernia; that none of these health care professionals referred him for surgery for his hernia because Wexford's position on the treatment of hernias was that surgery for hernias was "cosmetic" and elective and Wexford, therefore, would not pay for them; after nearly two years from the onset of his groin pain and his suffering increasing, excruciating pain over that period, plaintiff finally had surgery to repair his hernia on May 11, 2018; he suffered complications, and extended pain, from that surgery due to the long delay between the onset of his condition and the surgery. The extended version of the complaint follows.

2

On June 10, 2016, plaintiff began experiencing pain in his right groin area where he discovered a tiny knot on self-examination. On June 17, 2016, he got on sick call and saw a nurse. The nurse informed him he had an upcoming appointment to see Dr. Dominguez and to let the doctor know of his new groin issue. On June 20, 2016, plaintiff went to see Dr. Dominguez for his pre-existing liver disease. She told plaintiff that because he had been treated for his liver disease, he would no longer be seen by her. Plaintiff told her about his groin pain, that the nurse on sick call had told him to tell Dr. Dominguez about his groin pain, and that he was in excruciating pain. Dr. Dominguez told him to see a nurse on sick call about his groin pain.

On June 30, 2016, plaintiff saw a nurse practitioner on sick call about his groin pain. She examined him and stated it was some mild tenderness that in time would go away. On August 9, 2016, plaintiff was seen by nurse practitioner Tuell who determined he had an inguinal hernia. At that time, plaintiff informed Tuell that the knot was getting bigger and was excruciatingly painful. Tuell said she would put him in for a surgery consult with the medical director and Dr. Funk who determine if surgery is necessary. She further informed plaintiff that Funk and Wexford do not approve these types of surgery because they are cosmetic and elective.

On September 9, 2016, plaintiff again got on sick call because of the increasing pain and growing hernia causing pain to shoot down into his testicles and interfering with his mobility and ability to sleep. Plaintiff was later seen by the medical director, Dr. Chamberlain, who, after examining plaintiff, explained that Funk and Wexford do not approve hernia surgeries because they are cosmetic in nature and elective regardless of the size, or the pain he was in. Surgery was only approved for a hernia if it was strangulated or migrates to the scrotum. Plaintiff saw Chamberlain on numerous occasions between September 9, 2016, and March 6, 2017, advising Chamberlain that the hernia was getting bigger and more painful, but Chamberlain would not refer him for a surgical consult or prescribe stronger pain medication.

Plaintiff saw Dr. James, who was filling in for Chamberlain, on January 24, 2017. James reviewed plaintiff's medical file but told plaintiff he could not override Dr. Chamberlain and Dr. Funk. James told him to keep taking his pain medications.

On May 24, 2017, June 8, 2017, and June 9, 2017, plaintiff saw Dr. Varma, who would not put plaintiff in for hernia surgery and during the June 9, 2017, visit, told him not to bring up the hernia because Wexford would not pay for him to have surgery.

On June 23, 2017, plaintiff saw a nurse on sick call who told him the doctors were upset with plaintiff and didn't want to see him about the hernia anymore and scheduled plaintiff to see N.P. Tuell. On June 28, 2017, plaintiff saw Tuell who issued him an Egg-Crate Mattress but could do nothing to relieve the pain which was up to Chamberlain, Funk, and Wexford.

On July 7, 2017, plaintiff saw Dr. Obiasi, who after examining plaintiff's hernia and testicles, told plaintiff that even though the hernia was big and causing pain, that he had seen bigger hernias and that he would only put plaintiff in for a consult for surgery with Wexford if the hernia had migrated to the scrotum. He told plaintiff he did not believe plaintiff's hernia qualified by his standards or Wexford's for surgery.

Plaintiff was seen by Dr. Rankin on July 22, 2017. Rankin would not address the pain plaintiff was in even though Rankin could clearly see plaintiff was in pain. Plaintiff saw Rankin

again on August 27, 2017. Rankin would not look at plaintiff's hernia or address the issue even though plaintiff told him the hernia had gotten bigger.

On August 30, 2017, while on a medical writ to U of I Chicago Medical Center, plaintiff fell while exiting a transport van. On September 8, 2017, plaintiff got on sick-call and told the nurse his hernia had gotten bigger, and his groin and stomach pain had gotten worse, since he had fallen. On September 11, 2017, and September 21, 2017, plaintiff was seen by Dr. Roz who acknowledge that corrective surgery was available but stated that by Wexford policies hernias were cosmetic and elective and that he had seen that plaintiff had sought help on numerous occasions from multiple doctors and that there was nothing he could do.

On October 31, 2017, November 27, 2017, and December 19, 2017, plaintiff was seen by Dr. Zahtz who examined him and told him Wexford did not like to pay for hernia surgeries.

On January 2, 2018, plaintiff went to a U of I gastroenterologist for a colonoscopy who determined that plaintiff's hernia made it too dangerous to perform the colonoscopy and ordered that the prison physician submit plaintiff for hernia surgery.

On January 7, 2018, plaintiff saw Dr. Rankin as a follow-up to his January 2, 2018, U of I appointment. Rankin "looked at plaintiff's file and read the surgeon's order for surgery," examined plaintiff's hernia and said he would not submit plaintiff for hernia surgery because it was cosmetic and elective, and he disagreed with the U of I doctor's order.

On January 22, 2018, plaintiff was seen by N.P. Tuell. Plaintiff advised Tuell that Rankin would not submit him for surgery despite the U of I doctor's order. Tuell told him she could not go over the doctor's head and that with Dr. Funk being over her there was no one else to go to even if she wanted to and that Funk would not approve hernia surgery for plaintiff.

On February 6, 2018, plaintiff was sent back to U of I for an ER scan of his hernia and stomach as had been ordered by the U of I doctor on January 2, 2018. On March 26, 2018, the U of I specialist again ordered the prison medical director for plaintiff to have hernia surgery. Zahtz did not agree to the process. On April 16, 2018, plaintiff went to U of I for an MRI. On May 11, 2018, plaintiff finally had hernia surgery at U of I. Plaintiff suffered complications during this surgery. On May 12, 2018, plaintiff was discharged from U of I and placed in the prison infirmary. On May 15, 2018, plaintiff was seen by Zahtz, who determined the hernia mesh did not hold and that the hernia was now protruding into plaintiff's scrotum. Plaintiff continued to have swelling in his scrotum. On May 21, 2018, N.P. Tuell determined there was an infection in plaintiff's scrotum which was badly swollen.

On May 23, 2018, plaintiff went to U of I for a prostate biopsy. On being examined, U of I physicians determined that either the hernia mesh did not hold or that there was tremendous post-operative swelling in the testicles and scrotum and that plaintiff needed corrective surgery. The biopsy couldn't be performed. On May 29, 2018, and June 13, 2018, plaintiff saw Zahtz who would not send plaintiff out as an emergency to relieve the trapped strangulated hernia. On June 11, 2018, plaintiff saw a psychiatrist and told her what he had been going through. That day he was sent back to U of I. Doctors there examined him and told him there were post-surgery affects and to continue compresses and pain medication and that what he was experiencing would subside.

4

For five weeks after surgery plaintiff had to use a wheelchair. On different occasions from May 12, 2018, to December 10, 2018, plaintiff got on sick call or told the medical staff about the post-surgery complications he experienced.

Wexford

Wexford argues plaintiff has not alleged a policy or widespread practice of denying inmates hernia surgeries and has not alleged a single instance where Wexford refused to approve plaintiff for surgery. Wexford argues plaintiff's allegations make it clear that his medical providers at the prison felt his hernia was cosmetic in nature and did not require surgery. However, the allegations from the complaint set out above recite numerous occasions where Wexford medical personnel told plaintiff that Wexford and Dr. Funk, Wexford's Regional Medical Director did not approve hernias for surgical repair because they deemed hernia surgeries to be cosmetic and elective. The court has previously found on similar allegations that Wexford's allegedly deeming hernia surgeries "cosmetic" and refusing to pay for them "would represent a policy that may show deliberate indifference to an inmate's medical needs" and "suggests the possibility of a practice rather than a treatment decision aimed solely at the plaintiff." *Irvin v. Wexford Health Sources, Inc*., No. 18 cv 50105, 2019 WL 6911968, * 3 (N.D. Ill. Dec. 19, 2019). Plaintiff's allegations here likewise adequately state a claim that Wexford's policy or practice of deeming hernia surgeries to be cosmetic and refusing to approve them on that basis "may show deliberate indifference to an inmate's medical needs."

Chamberlain

The Wexford Defendants contend the complaint fails to allege facts from which it can be inferred Dr. Chamberlain was deliberately indifferent to plaintiff's serious medical needs. The Wexford Defendants maintain plaintiff's allegations show Chamberlain saw plaintiff for an assessment of his hernia and came to the medical judgment that surgery was not warranted. However, taking the allegations most favorably to plaintiff, the complaint alleges Chamberlain was not exercising medical judgment but was failing to exercise medical judgment by failing to take any action to seek a surgical repair of plaintiff's hernia due to his understanding that Wexford did not want to pay for hernia surgeries. The allegations are sufficient to meet the minimal requirements to survive a Rule 12(b)(6) motion. It can be inferred from the complaint that Chamberlain was aware that a substantial risk of serious harm existed and that his response demonstrated an absence of professional judgment. *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 753 (7th Cir. 2021).

James

James saw plaintiff once on January 24, 2017, when he was filling in for Chamberlain. Plaintiff "explained all that he was going through with the hernia." James reviewed plaintiff's file, told plaintiff he could not override Chamberlain and Funk and to keep taking his pain medication. The allegations concerning this one interaction between James and plaintiff are insufficient to state a deliberate indifference claim against him. The allegations are too sparse to allow an inference that James was intentionally denying plaintiff access to necessary medical care in the face of a serious medical need.

Rankin

Plaintiff alleges he saw Rankin on July 22, 2017, Rankin refused to address plaintiff's pain though he could clearly see plaintiff was in pain and refused to examine the hernia. Plaintiff again saw Rankin on August 27, 2017. Rankin would not look at plaintiff's hernia or address the issue even though plaintiff told him the hernia had gotten bigger. On January 7, 2018, plaintiff saw Dr. Rankin as a follow-up to his January 2, 2018, U of I appointment where the U of I doctor had ordered surgery for plaintiff's hernia. Rankin "looked at plaintiff's file and read the surgeon's order for surgery," examined plaintiff's hernia and said he would not submit plaintiff for hernia surgery because it was cosmetic and elective, and he disagreed with the U of I doctor's order.

The Wexford Defendants argue these allegations show Rankin's opinion that plaintiff's hernia surgery would be elective demonstrates a medical judgment and that a mere disagreement between providers is not actionable under section 1983. However, refusing to follow a specialist's orders can be a basis for a deliberate indifference claim. *Perez*, 792 F.3d at 778, citing *Jones v. Simek*, 193 F.3d 485, 490-91 (7th Cir. 1997). These allegations are enough to survive a Rule 12(b)(6) motion.

Funk

Plaintiff does not allege he ever saw Funk for his hernia. As Wexford's Regional Medical Director, it was necessary for Funk to approve any referral for surgery proposed by Wexford's medical staff at Dixon. Plaintiff alleges N.P. Tuell told plaintiff when she saw him on August 9, 2016, that she would refer him to Chamberlain and Funk for a surgery consult for his hernia, but that Funk and Wexford did not approve hernia surgeries because they were cosmetic and elective. Plaintiff further alleges that when he saw numerous Wexford medical professionals about his hernia, they told him Funk would not approve hernia surgery because Funk believed hernia surgeries were cosmetic and elective. Since Funk's approval was required for a hernia surgery to be performed on an inmate, and Funk would not approve such surgeries, the Wexford medical professionals that plaintiff saw, other than Tuell on August 9, 2016, said they would not submit him for hernia surgery.

The Wexford Defendants argue plaintiff's claim against Funk fails because plaintiff alleges no personal involvement by Funk in plaintiff's treatment. There are no allegations Funk was even aware of plaintiff's hernia. Plaintiff argues it reasonably can be inferred from Tuell's telling plaintiff that she would refer him to Chamberlain and Funk for a surgery consult that Funk was personally involved in denying plaintiff surgery in August 2016 since plaintiff was not referred for surgery at that time. Plaintiff also contends that Dr. James telling him that James could not override Chamberlain and Funk is a basis for inferring Funk was involved in denying plaintiff's request for hernia surgery. These allegations are too tenuous to support an inference Funk was personally involved in denying/delaying plaintiff obtaining hernia surgery. Plaintiff does not make any other argument for Funk being liable to plaintiff. Plaintiff has failed to state a claim upon which relief can be granted against Funk.

Dominguez

Plaintiff's claim against Dominguez is based entirely on his one encounter with her on June 20, 2016. Plaintiff had an appointment on that date to see Dominguez about his pre-

existing liver disease. When he told her about his groin pain, she told him to see a nurse on sick call about his groin pain. Plaintiff alleges that based on this visit to Dr. Dominguez that she had actual knowledge of an objectively serious medical need (plaintiff's pain) and demonstrated deliberate indifference to that need by not seeing him but directing him to see a nurse on sick call. He alleges Dr. Dominguez, based on plaintiff describing to her the location of the pain and informing her there was a knot that came and went, had to know or should have known that it was a hernia that needed her medical attention.

Plaintiff provides no factual allegation from which it can be inferred that Dominguez, who was scheduled to see plaintiff for his liver disease, was aware that a substantial risk of serious harm existed and that her decision to tell plaintiff to see the sick-call nurse for his groin pain "was so inadequate that it demonstrated an absence of professional judgment." *Peterson*, 986 F.3d at 753.

The Wexford Defendants also argue plaintiff's claim against Dominguez is untimely. The statute of limitations is two years from when plaintiff discovered his injury. *King v. Newbold*, 815 Fed. Appx. 82, 85 (7th Cir. 2020). A deliberate indifference claim based on medical error accrues when a person knows his injury and its cause. *Id.* At least by the time he was seen by N.P. Tuell on August 9, 2016, plaintiff new he had a hernia that was causing his pain. Plaintiff argues the continuing violation doctrine makes his claim against Dominguez timely. The continuing violation doctrine delays the start of the limitations period until the date of the last injury inflicted by the defendant's deliberate indifference. *Devbrow v. Kalu*, 705 F.3d 765, 770 (7th Cir. 2013); *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001) ("Every day that [defendants] prolonged [plaintiff's] agony by not treating his painful condition marked a fresh infliction of punishment that caused the statute of limitations to start running anew.") However, the complaint alleges only the one encounter with Dominguez. There are no allegations she was involved in any later instances of alleged deliberate indifference. Liability under section 1983 must be based on the defendant's personal acts. *Hernandez v. Wexford Health Sources, Inc.*, No. 18-cv-2166-NJR, 2019 WL 763642, * 2 (S.D. Ill. Feb. 21, 2019). Actions of others alleged to have occurred within the limitations period, do not restart the limitations period as to Dominguez.

Plaintiff commenced this action on June 1, 2020, he saw Dominguez June 20, 2016, and was told by N.P. Tuell that he had an inguinal hernia on August 9, 2016. These events occurred nearly four years before plaintiff filed suit against Dominguez. Without allegations Dominguez acted with deliberate indifference within the two-year limitations period, the continuing violation doctrine does not apply to save plaintiff's claim against Dominguez. Plaintiff's claim against Dominguez is time barred.

<u>IDOC Defendants</u>

In addition to the Wexford Defendants, plaintiff sues four IDOC employees: Warden Varga; Grievance Officer Martens; IDOC Director Baldwin; and IDOC Administrative Review Board Chairperson Johnson. Plaintiff argues that the liability of the IDOC Defendants "stems from their complete inaction to the Plaintiff's grievances submitted on June 8, 2018, and/or July 9, 2018." "[A] prison official may be found to be deliberately indifferent to a prisoner's serious medical need if he has a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Irvin*, 2019 WL 6911968 at * 6 (quotation marks and citation omitted). Deliberate indifference may be found where a prison official knows

about unconstitutional conduct and facilitates, approves, or turns a blind eye to it. *Perez*, 792 F.3d at 781.

Plaintiff alleges Martens had direct knowledge of plaintiff's medical issues, pain, and suffering and of the deliberate indifference of the Wexford Defendants to plaintiff's serious medical needs but followed his "systemic routine" of "denying any grievance before him."

Plaintiff alleges Varga had ample opportunity to investigate and review the serious challenges plaintiff presented to the medical decisions made by the Wexford Defendants through the grievance process but ignored the grievances filed by plaintiff. Varga was aware of the Wexford Defendant's deliberate indifference to plaintiff's serious medical needs but deployed a systemic routine in dismissing and denying grievances as non-emergencies and "rubber-stamping" any decision of the grievance officer causing plaintiff to suffer further injury and pain.

Plaintiff alleges Johnson and Baldwin had direct knowledge of plaintiff's medical issues, pain and suffering and of the deliberate indifference of the Wexford Defendants, Varga, and Martens to plaintiff's serious medical needs but condoned the deliberately indifferent actions of these other defendants by turning a blind eye to plaintiff serious medical needs and parroting the findings of Martens and Varga.

Plaintiff's complaint alleges that on May 23, 2018, he went to U of I for a prostate biopsy which could not be performed due to the post-operative swelling from his hernia surgery on May 11, 2018. The attending physician, after conferring with the chief surgeon, determined plaintiff needed corrective surgery. Plaintiff was not referred for the corrective surgery after returning to Dixon.

Plaintiff argues that in his June 8, 2018, grievance ("June Grievance") he specifically requested he be referred for this surgery. He contends that the IDOC defendants ignored this request in his grievance. In considering a motion to dismiss the court considers not only the complaint, but documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice. *Phillips v. Prudential Life Insurance Co. of America*, 714 F.3d 1017, 1020 (7th Cir. 2013). A court may take judicial notice of its own court documents and records. *Herz v. Hamilton*, No. 1:15-cv-161-WTL-DML, 2015 WL 1224516, * 1 (S.D. Ind. 2015).

Per the allegations in complaint, plaintiff was sent back to U of I on June 11, 2018, where he was examined by physicians. The physicians told him there were post-surgery affects he had experienced and that he should continue the compresses and pain medication and that the problems he was experiencing would subside. The court's records contain both grievances referenced in plaintiff's complaint and in his brief. The June Grievance asked that plaintiff be immediately returned to UIC for corrective surgery. The record shows Varga received the June Grievance on June 13, 2018, and the same day determined it was an emergency and directed it to be reviewed on an expedited basis. The record shows Martens reviewed plaintiff's chart on June 13, 2018, which showed plaintiff "was just seen by UIC general surgery for follow up to his hernia surgery on 6/11/18." Dkt # 44-2, p.7. "UIC found no abnormalities or failed hernia surgery." *Id.* "There was no evidence of strangulation, failed surgery, or mesh that had dropped anywhere." *Id.* Martens recommended the June Grievance be denied as he was "reasonably satisfied that Inmate Stewart had access to health care." *Id.* The June Grievance shows Varga

concurred, that plaintiff appealed, and that the ARB (through Johnson) and Director Baldwin concurred.

Plaintiff alleges in his complaint that he was examined by the U of I doctors on June 11, 2018, and they told him the post-surgical problems he was experiencing would subside. The complaint does not allege they believed corrective surgery was required. This examination of plaintiff by the U of I doctors occurred before any action by any of the IDOC Defendants on the June Grievance. The June Grievance had sought to have plaintiff referred for corrective surgery per the recommendation made at U of I on May 23, 2018, but when plaintiff returned to U of I to be examined on June 11, 2018, surgery was not recommended.

The complaint does not plausibly allege deliberate indifference by the IDOC Defendants based on their handling of the June Grievance. By the time the IDOC Defendants were reviewing the June Grievance, plaintiff had already been referred to, and examined by, the doctors at U of I who did not recommend corrective surgery. They recommended plaintiff continue with his current treatment. Plaintiff does not appear to be arguing that the IDOC Defendants should have ordered corrective surgery after the U of I physicians had recommended he continue his then current course of treatment.

As to the July 9, 2018, grievance ("July Grievance"), the relief requested is "to be duly compensated for my pain and suffering." *Id.*, p. 9. Monetary compensation is not available through the IDOC grievance process so the IDOC Defendants cannot be liable for not providing it. The July Grievance deals exclusively with plaintiff's medical treatment from 2016 to his May 2018 surgery. The purpose of the July Grievance appears to be satisfying the exhaustion of administrative remedies requirement to enable plaintiff to bring the current lawsuit against the Wexford Defendants. Plaintiff offers no argument as to how the IDOC Defendants were deliberately indifferent to his serious medical needs in the handling of the July Grievance. He does not state what the IDOC Defendant's could have done in July 2018 to remedy the alleged deliberate indifference of the Wexford Defendants spanning the 2016 to May 2018 period.

Plaintiff has failed to state a claim for deliberate indifference against the IDOC Defendants for their handling of either grievance. Rejecting an administrative complaint about a completed act of misconduct does not violate the Constitution. *George v. Smith*, 507 F3d. 605, 609-610 (7th Cir. 2007).

For the foregoing reasons, the IDOC Defendants' motion [94] to dismiss is granted. The Wexford Defendants' motion [88] to dismiss is granted as to Dominguez, James, and Funk and denied as to Wexford, Chamberlain, and Rankin. If plaintiff believes he can file an amended complaint as to the dismissed defendants that comports with the requirements of Fed. R. Civ. P. 11, he may do so on or before December 30, 2022. The parties are directed to contact Magistrate Judge Jensen within 30 days to explore settlement possibilities.

Date: 11/22/2022                                          ENTER:

                                          *Philip G. Reinhard*
                                          United States District Court Judge

                                          Electronic Notices.